UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **THE PENTECOSTAL CHURCH OF DEQUINCY** | **CASE NO. 2:22-CV-02782** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **CHURCH MUTUAL INSURANCE CO S I** | **MAGISTRATE JUDGE LEBLANC** |

<u>**MEMORANDUM RULING**</u>

Before the Court are three motions: (1) "The Pentecostal Church of DeQuincy's Motion for Partial Summary Judgment" (Doc. 85) wherein the Plaintiff moves to dismiss Defendant, Church Mutual Insurance Company, S.I.'s ("Church Mutual") allegations of fraud made in its counterclaim against the Church; (2) "The Pentecostal Church of DeQuincy's Motion to Strike Pursuant to FRCP Rule 12(F)" (Doc. 86) wherein Plaintiff moves to strike certain allegations and Paragraphs in Church Mutual's Amended Answer, Affirmative Defenses and Counterclaim; and (3) "The Pentecostal Church of DeQuincy's Motion to Dismiss Counterclaim for Failure to State a Claim Pursuant to FRCP12(b)(6)" (Doc. 89), wherein Plaintiff moves to dismiss Church Mutual's counterclaim for failure to state a cause of action. Because these three motions involve the same issue and claim, the Court will address them collectively.

## FACTUAL STATEMENT

In 2017-2018 the Pentecostal Church of DeQuincy (hereinafter referred to as the "Church") began a "Build Campaign,"[1] that advanced its goal of $3,000,000.[2] Due to increased attendance, the purpose of the Build Campaign was to construct a new Christian Education Building and Event Center.[3] The Church had a $6,166,400 budget, excluding architect's fees.[4]

In 2019, the Church filed suit against Church Mutual for damages from a 2017 tornado. That suit settled on October 24, 2022, during the pendency of the current matter.[5]

In early January 2020, the Church retained the services of Inman Architecture, LLC for designs/drawings to renovate "exiting metal building and the addition of a new structure, Sunday school classrooms, early childhood spaces, a children's worship space, youth center facilities (including classrooms, worship and gym areas) and spaces for adult ministry."[6] Inman rendered those drawings in March 2020, however, the project was put on hold during the 2020 Covid pandemic.[7] On June 25, 2020, Inman wrote to a surveyor that "[t]he pastor would like to move forward with the surveying we've discussed.[8] Other exchanges were made between Inman and the surveyor as to the project pre-Hurricane Laura.[9] On October 6, 2020, Inman rendered AutoCAD drawings.[10]

---

[1] Defendant's exhibit C, pp. 407-412.
[2] *Id.* at 412.
[3] *Id.* at 408.
[4] Defendant's exhibit D.
[5] Civil action No. 2:19-1656.
[6] Defendant's exhibit G, pp. 238-41.
[7] *Id.* p. 167.
[8] *Id.* at 204.
[9] *Id.* at 175-76.
[10] *Id.* at 133.

On August 27, 2020, Hurricane Laura made landfall in Southwest Louisiana. In the original Complaint, the Church alleges that it sustained damage from the Hurricane, and that Church Mutual has underestimated the cost of repairs. The five (5) buildings considered as "Covered Property" at issue in this litigation are identified as the: (1) Sanctuary, (2) Activity Center, (3) Sunday School/Fellowship Hall, (4) Mobile Home, and (5) Pole Barn. During the relevant time period, Church Mutual provided coverage for the Covered Property.

Church Mutual was aware of the pre-loss condition of the Covered Property due to its investigation of the loss claim caused by a tornado in 2017.[11]

The Church reported its claimed loss on September 1, 2020, after which Church Mutual initially assigned Troy Knight as the "Claim Handler"[12] and Engle Martin & Associates ("Engle Martin") as the outside adjusting company.[13] Engle Martin set up an Xactanalysis file for the Church's claim.[14] Xactanalysis is an Xactimate-based distribution system used to send assignments.[15] Church Mutual's initial directive to Engle Martin was to complete a building valuation; perform an on-roof inspection and secure a lift if needed; determine the cause of loss; provide interior and exterior photos, scope, and diagram of damaged/undamaged areas with narrative report and estimate; inspect all buildings for damage; confirm mitigation has been initiated; and immediately contact the insured.[16]

---

[11] *Id.* p. 53:12-24.
[12] Plaintiff's exhibit 4.
[13] Plaintiff's exhibit 3.
[14] Plaintiff's exhibit 67, Renlund depo. p. 162:1-4.
[15] Plaintiff's exhibit 6, Bennett Kennedy deposition, 35:13-15.
[16] Plaintiff's exhibit 4.

On September 2, 2020, Church Mutual set a $5.00 reserve.[17] Engle Martin assigned Ben Kennedy, a licensed appraiser, as the general adjuster to conduct the field inspection of the Covered Property.[18] Kennedy contacted a representative of the Church on September 3, 2020, and "advised [that the Church] should mitigate by tarping the roof and calling a mitigation company."[19]

On September 8, 2020, Kennedy performed an inspection of the Covered Property that lasted approximately 4.5 hours.[20] During that inspection, he took 112 photographs and documented the damage as well as the mitigation work being performed by Service Master.[21] On September 10, 2020, Kennedy contacted Church Mutual's claim handler, Knight, to explain the status of the Covered Property and the mitigation efforts.[22]

Kennedy testified in his deposition that he observed extensive damage to the Sanctuary,[23] and his Immediate Advice Report indicated that he observed that the "wind caused the steeple from the peak of the church to fall into the sanctuary hall, causing extensive damage to the roof and framing system, along with interior water damage," plus "moderate damage to other buildings at the church campus."[24] Kennedy also reported that he anticipated "a substantial repair scope as a result [sic] this loss."[25] He also noted that

---

[17] Plaintiff's exhibit 2, p. 97. This number is fluid and changes as further information is gathered and was only set at $5 as a notation to get a software entry open. Plaintiff's exhibit 6, Kennedy depo. p. 76:22-23.
[18] Plaintiff's exhibit 5.
[19] *Id.*
[20] Plaintiff's exhibit 6, Kennedy deposition, pp. 57:4-9, 61:8-62:3.
[21] *Id.* p. 68:10-13; Plaintiff's exhibit 7.
[22] Plaintiff's exhibit 5; Plaintiff's exhibit 6, Kennedy deposition, pp. 80:22-81:13.
[23] *Id.* pp. 92:14-20.
[24] Plaintiff's exhibit 9, p. 1.
[25] *Id.* p. 3.

Service Master had encountered "some areas they couldn't dry."[26] Kennedy recommended and coordinated securing a building consultant and engineer.[27]

Kennedy estimated the loss to be $950,000,[28] and requested a $50,000.00 advance to the Church.[29] Kennedy reached out to Chuck Homolka on September 19, 2020, and requested his "input regarding the file."[30] Homolka responded on September 21, 2020, and advised that the file would be assigned to an Executive General Adjuster at Engle Martin who handled losses in excess of half a million dollars.[31]

Also on September 21, 2020, Patrick McEnaney, of Martin Engle,[32] was assigned to the Church's claim replacing Knight.[33] On September 22, 2020, Church Mutual paid the Church $50,000.00 as an advance payment for initial clean up.[34] The claim was eventually given to Trey Johnson, a field adjuster for Sedgwick.[35] An email was sent to Trey Johnson on September 21, 2020, that included Kennedy's September 14, 2020 Immediate Advice Report.[36] Trey Johnson was hired to evaluate the damages of the Covered Property, which included documenting the damages, and determining whether other experts, such as an engineer or building consultant would be needed.[37]

---

[26] Plaintiff's exhibit 6, Kennedy depo. pp. 146:16-147:3.
[27] Plaintiff's exhibit 5; Plaintiff's exhibit 6, Kennedy Depo. pp. 124:23-126:11.; 127:6-21.
[28] Plaintiff's exhibit 9, p. 3.
[29] *Id.*
[30] Plaintiff's exhibit 2.
[31] Plaintiff's exhibit 6, p. 140:4-20.
[32] Plaintiff's exhibit 67, Renlund depo. pp. 161:23-!62:1; Plaintiff's exhibit 10, Kevin Miller Deposition, p. 149:19-24.
[33] Plaintiff's exhibit 11; Knight was also not a Large Loss Claims Handler.
[34] Plaintiff's exhibit 67, Renlund depo. pp. 98:19-99:2.
[35] *Id.* p. 22:18-21; Plaintiff's exhibit 10, Kennedy depo. 161:3-19.
[36] Plaintiff's exhibit 12.
[37] Plaintiff's exhibit 67, pp. 81:7-14; 82:9-24.

Johnson coordinated another inspection on September 29, 2020, with building consultant company, United Building Sciences ("UBS") and Robert Spengler, and engineer, Michael Stenstrom.[38] Spengler's team created three versions of the Scope and Cost report, which did not include invoices from the two mitigation companies.[39] Stenstrom presented his engineering report to Church Mutual on November 2, 2020.[40]

On October 19, 2020, Kevin Miller had a limited assignment to assist with setting a reserve.[41] On October 21, 2020, Johnson set a Rough Order of Magnitude at $1,480,000.00.[42] In November 2020, Plaintiff's expert estimated the damage to be approximately $1.8 million.[43]

On December 16, 2020, the claim was re-assigned to Miller.[44] On January 12, 2021, Miller issued payment to the Church for $384,300.27.[45] On February 9, 2021, Miller fired Johnson and hired Jeff Conrad for another inspection to take place. Conrad inspected the Covered Property on February 22, 2021, and produced his First Report on February 24, 2021.[46] Miller hired Shay Davis, with Cavalry Construction, who inspected the Covered Property on March 5, 2021, and wrote an estimate using Xactimate.[47] As of this date, the demolition project had already started and was almost complete.  The Xactimate submitted

---

[38] Plaintiff's exhibit 63, Robert Spengler, pp. 8:2-3; 8:5-8; 52:13-10, 12:25-13:5.
[39] *Id.* pp. 81:4-24; 97:4-8; Church Mutual was aware as of September 14, 202, that Service Master was providing the Church mitigation services and that Johnson had authorized Roadrunner to provide moisture mapping services and to work on additional water issued at the Church's Covered Property.
[40] Plaintiff's exhibit 20.
[41] Plaintiff's exhibit 10, Miller depo. pp. 126:25-127:13.
[42] Plaintiff's exhibit 16, Plaintiff's exhibit 10
[43] Defendant's exhibit B, Doc. 98-2.
[44] Plaintiff's exhibit 2, p. 93.
[45] Plaintiff's exhibit 22.
[46] Plaintiff's exhibit 23 Doc.89-5, 6.
[47] Plaintiff's exhibit 64, Shay Davis deposition, p. 14; Plaintiff's exhibit 24, Doc. 89-7.

by Plaintiff includes the Pole Barn and Dwelling; it does not include any of the other Covered Property.[48]

In October 2020, the Church began shopping for interest rate information for a future construction loan.[49] The Church provided Sabine Bank its financial records for the years, 2018, 2019, and 2020 to evaluate its credit.[50] Sabine Bank initially loaned the Church $2,000,000.00, which was later increased and absorbed into the increased loan.[51] Sabine Bank took a security interest in any insurance proceeds.

On October 13, 2020, Chad Parks, a design engineer for Meranto Construction, produced design drawings for the Sunday School and classrooms for the educational building (Sunday School/Fellowship Hall).[52] On October 22, 2020, a drawing that included an "expansion" was produced.[53]

At some point, the Church considered changing the footprint of the Sanctuary to eliminate the balcony. At some unknown date, the Church entered into an oral agreement with Meranto Construction to demo the Church to the red iron and build a brand new church.[54]

On January 28, 2021, Lesa Russell from the Church emailed Lee Covington of Church Mutual regarding policy changes and premiums and noted that "Building 1 is main

---

[48] *Id.*
[49] Plaintiff's exhibit 37; Plaintiff's exhibit 38, Lauren O'Neal deposition pp. 20:22-21:21.
[50] Plaintiff's exhibit 48, Stacey Alford deposition, p. 173:12-15.
[51] *Id.* pp. 24:19-25:9; 145:2-146:2, 147:20-148:16.
[52] Plaintiff's exhibit 40, Chad Parks deposition, pp. 26:18-28:1.
[53] *Id.* p. 28:1-3.
[54] Plaintiff's exhibit 39, Keith Meranto deposition, p. 62:5-63:3.

church which will probably be taking down to red Iron soon and starting reconstruction."[55] The email also stated that "Building 5 would be old church and adjoining Sunday school. To be torn down soon."[56] Church Mutual's Litigation Note entered January 29, 2021, states that the Church was considering demolishing the Sunday School building because it has been unsafe for use and unoccupied since the 2017 tornado.[57]

On January 29, 2021, the Church settled on a design for the new Sanctuary,[58] and by February 24, 2021, it had decided to demolish the Sanctuary.[59] On March 2, 2021, Meranto Construction completed demolishing the Sunday School/Fellowship Hall and the Sanctuary on March 7, 2021.[60] On April 6, 2021, the Church and Meranto Construction executed the Design/Build contract for the Sanctuary and the Education Building (Sunday School).[61] Meranto Construction estimated the build-back for the Covered Property to be $5,300,000.00,[62] which became the basis of the Church's Proof of Loss. The Proof of Loss, dated July 15, 2022, demanded that the remainder of the policy limits be paid.[63] Specifically the Church stated that $3,442,423.82 was due within the statutory time frame under Louisiana law.[64] The Church relied upon the Meranto Construction Design/Build contract to support its Proof of Loss.

---

[55] Plaintiff's exhibit 45, p. 3-CMIC003292; It appears that Plaintiff is using this email to suggest that Church Mutual had notice that the Sanctuary was going to be demoed. Plaintiff does not explain Lee Covington's position with Church Mutual, and/or if this information was forwarded to Church Mutual's claims handler, nor does Plaintiff cite to any Church Mutual Log Notes regarding same.
[56] *Id.*
[57] Plaintiff's exhibit 44, p. 452.
[58] Plaintiff's exhibit 40, Parks deposition, p. 43:19-44:2.
[59] Plaintiff's exhibit 46, Building Permit to demo issued to Meranto.
[60] Plaintiff's exhibit 39, Meranto depo. pp. 54:20-56:12.
[61] Plaintiff's exhibit 47; Plaintiff's exhibit 39, Meranto depo., 61:23-62:4.
[62] Plaintiff's exhibit 39, Meranto depo. pp. 145:-147:22; 153:9-154:2, Plaintiff's exhibit 73-Schedule of Values.
[63] Plaintiff's exhibit 3, Doc. 86-4.
[64] *Id.*

## S<small>UMMARY</small> J<small>UDGMENT</small> S<small>TANDARD</small>

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F<small>ED</small>. R. C<small>IV</small>. P. 56. The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the motion for summary judgment if the movant fails to meet this burden. *Id*.

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted). This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material

fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## LAW AND ANALSYSIS

Church Mutual has alleged fraud against the Church in its Answer and Counterclaim,[65] specifically alleging that the Church (1) inflated its property values during the loan process with Sabine Bank,[66] (2) intentionally misrepresented facts in the Affidavit of Kyle, who was instructed by the Church to demolish the Sanctuary,[67] (3) intentionally inflated its Proof of Loss and demolished the Sanctuary, despite no expert or building consultant opining that the Sanctuary should be demolished and rebuilt, and despite approximately $500,000.00 in remediation and mitigation work being performed pre-demolition, (4) sold salvageable items that could have been used for continued repairs, as recommended by Plaintiff's expert, and (5) intentionally used the Hurricane Laura loss as a means to build a new Church that was a betterment as opposed to a pre-loss condition of like kind and quality.

Specifically, Church Mutual alleges that the Church fraudulently (1) concealed documents that showed that its claim was less than its demands, (2) sold HVAC units and other property that were in working condition, (3) sought reimbursement for work performed that later it intentionally demolished, and (4) inflated its claim to over $8 million

---

[65] Doc. 83.
[66] Church Mutual alleges that the values of the property submitted to Sabine Bank are made up numbers, and that no independent party has ever valued the property over $4 million. Doc. 83, ¶ 18.
[67] Kyle testified that he did not prepare the Affidavit, and that the statement that the brick wall collapse was unintentional was false. Plaintiff's financial secretary, Lesa Russell, prepared and notarized the Affidavit.

after telling others it was worth $2 million. In its counterclaim Church Mutual moves for declaratory judgment and requests that the Court rule that the Policy issued to the Church is null and void. Additionally, Church Mutual requests a return of all sums paid on the Church's claim minus the premiums paid by the Church.

*Claim of fraud against the Bank*

Church Mutual has asserted that the Church fraudulently concealed information and made misrepresentations to Sabine Bank to secure financing to fulfill the April 6, 2021, Meranto design/build contract (hereinafter referred to as the "Meranto contract").[68] Church Mutual contends that the Church informed Sabine Bank, during the loan process for collateral purposes, that its insurance claim was worth $2 million, however, it fraudulently asserted to Church Mutual that its claim was worth $5.5 million. Church Mutual argues that both statements cannot be true at the same time. Church Mutual submits summary judgment evidence through Plaintiff's expert that indicates that the Church's losses to the sanctuary were estimated to be approximately $1.8 million and another estimate dated May 2022, by Plaintiff's expert that the Church's losses for all of the structures totaled $2,487,566.72.

The Church argues that these estimates were just estimates. Church Mutual argues that a $3.5 million disparity is beyond logic. Here, it appears that Church Mutual is not asserting fraud against Sabine Bank during the loan process, but it is buttressing its claim of fraud by the Church against Church Mutual by showing that while the Church has

---

[68] Doc. 83, ¶ 164.

claimed to Sabine Bank that its value of loss is $2 million, it asserts a must larger value of loss to Church Mutual. As noted by Church Mutual, both assertions cannot be true. However, negotiations between parties in a civil action always involve fluid offers of settlement. This is not the equivalent of fraud.

*Prior plan to rebuild the Sanctuary and Sunday School/Fellowship Hall*

In its Counterclaim, Church Mutual alleges that the Church had a plan to demolish the Sanctuary prior to Hurricane Laura. The Church asserts that prior to Hurricane Laura, it had an "interest" in improving its educational ministry and sought the design of a new Christian Education Building that included integrating the existing structure into the Center.[69] Consequently, prior to the Hurricane, the Church had hired Jenn Inman, a design architect to move forward with that plan, but that plan did not include tearing down the sanctuary.[70] The Church remarks that due to the damage to the Sanctuary,[71] from Hurricane Laura, it was forced to re-evaluate its Christian Education Building plans.

The Church has submitted summary judgment evidence that it entered into an oral agreement with Meranto Construction for restoration work that at first focused solely on the Sunday School.[72] On October 13, 2020, the first design drawings for the educational building were produced by Chad Parks, a design engineer for Meranto Construction.[73]

On October 22, 2020, Parks produced a drawing that included an "expansion" and the Church that considered changing the footprint of the Sanctuary to eliminate the

---

[69] Plaintiff's exhibit 29.
[70] Plaintiff's exhibit 26, Jenn Inman deposition, pp. 21:5-22-22:14.
[71] Plaintiff's exhibit 31.
[72] Plaintiff's exhibit 39, Meranto depo., p. 62:5-18.
[73] Plaintiff's exhibit 40, Chad Parks depo., pp. 26:18-28:1.

balcony; that plan did not include demolishing the Sanctuary.[74] On January 29, 2021, the Church settled on a design to renovate the Sanctuary that would involve substantial construction,[75] and on February 24, 2021, Meranto Construction obtained a permit to demolish the Sanctuary.[76] The demolition project began on March 2, 2021, and was completed by March 7, 2021.[77] The Church and Meranto entered into the Meranto contract for the rebuild of the new Sanctuary/Education Building on April 6, 2021.[78]

The Court notes that on February 1, 2021, while discussing policy premiums and inquiring as to "which buildings is the church considering dropping coverage?" with another Church Mutual department, (not the claims department), Lesa Russell sent an email to Lee Covington and informed him that "Building 1 is main church which we will probably be taking down to red Iron soon and starting reconstruction" and "Building 5 would be old church and adjoining Sunday school. To be torn down soon."[79] The Church argues that its decision regarding the "decision to alter the structures on its campus" was made due to the damages from Hurricane Laura.[80]

Church Mutual contends that the Church knew prior to Hurricane Laura that it was going to demolish the Sanctuary and Sunday School/Fellowship Hall, and rebuild them as one combined structure. To support its assertion, Church Mutual has provided summary judgment evidence of the Church's Build Campaign in 2017, contact with Inman in 2019,

---

[74] *Id.* p. 28:1-3; Plaintiff's exhibit 41, Kyle deposition, pp. 37:25-38:2.
[75] Plaintiff's exhibit 40, Parks depo. p. 43:19-44:2.
[76] Plaintiff's exhibit 46; Plaintiff's exhibit 39, Meranto depo. p. 49:22-25.
[77] *Id.* pp. 54:20-56:12.
[78] Plaintiff's exhibit 47; Plaintiff's exhibit 39, Meranto depo. pp. 61:23-62:4.
[79] Plaintiff's exhibit 45, CNIC003292.
[80] Doc. 85-1, p. 9.

and the engagement of architect Inman on January 30, 2020, with a construction cost of $6,166,400.00.[81] Church Mutual also provides a string of emails authored by Inman pre-Hurricane Laura about the project that included, among other things, needing elevations and finish floor heights at the existing gym and sanctuary front foyer, and the minimum finish floor requirement for new structures, including renovations/additions or new buildings to provide for an "education/ministry center and a new gym/event center."[82]

Inman rendered an AutoCAD drawing on October 6, 2020, and Parks completed his first drawing on October 13, 2020;[83] Parks was aware that Inman has rendered complete drawings and testified that the newly constructed Church is similar to the drawings made by Inman's Pre-Hurricane Laura drawings.[84]

Church Mutual also submits the deposition testimony of Meranto employee Kyle, who testified that he was aware that the Church was working with a woman on designs and he found it "very interesting" that the current structure looks "a lot like the[]designs of Inman.[85] Kyle also testified that the Church started "spending money like crazy," so much so that he and the owner [Mr. Meranto] were worried.[86] Kyle further testified that the purpose of the excavators was to demo the structures, and that he was not aware of an

---

[81] Defendant's exhibits C (Unmarked but identified as Doc. 98-19, pp. 419-421 and D; Defendant's exhibit G, Inman depo. pp. 4-13, 161, 238-41;.
[82] Defendant's exhibit G, Inman depo. pp. 161, 167, 175-176, 194, 204, 238-41.
[83] Defendant's exhibits133; Plaintiff's exhibit 40,Parks depo. p. 93;1-19.
[84] *Id.* pp. 95-96.
[85] Defendant's exhibit J, Kyle depo. pp. 22-23, 44, 49, 63.
[86] *Id.* Kyle depo. p. 50.

engineer that thought the Church [sanctuary] needed to be demoed, but the Church wanted it demoed.[87] Kyle further testified that the "[t]he whole project was an upgrade."[88]

Church Mutual submits the deposition testimony of Keith Meranto who testified that the project was a 95% betterment and attributed the 5% reduction to the reuse of the red iron.[89] Church Mutual also submits Plaintiff's response to admission, which states the "Post-Hurricane Laura, an engineer did not advise Plaintiff that the buildings owned by Plaintiff needed to be torn down."[90]

Church Mutual relies on the above-mentioned summary judgment evidence and points to the fact that in November 2020, the Church's expert estimated damages to repair to be $1.8 million but in July 2022, the Church submitted to Church Mutual a proof of loss for approximately $5.5 million. Church Mutual also informs the Court that after it submitted its recent Counterclaim, it has not been afforded an opportunity to conduct discovery as to that Counterclaim. Additionally, Church Mutual notes that the Church hired an architect Pre-Hurricane Laura who rendered pencil drawings pre-Hurricane Laura of what would ultimately become the front façade of the now existing rebuilt church. Plaintiff's engineer believed that Inman's design was similar to his own, Keith Meranto thought the new church was similar to the Inman design, Kyle thought the end product was similar to the Inman design and testified that he could now see what was going on all along. Lastly, Church Mutual points out that the Church informed Sabine Bank that its insurance

---

[87] *Id.* pp. 48-49, 74
[88] *Id.* p. 59.
[89] Defendan'ts exhibit K, Keith Meranto depo. pp. 67-68.
[90] Defendant's exhibit L.

claim was valued at $2 million and yet submitted a Proof of Loss to Church Mutual for approximately $5.5 million.

"[F]raud must be proved by one who alleges fraud, but because of the nature of fraud it sometimes must be inferred from the existence of highly suspicious conditions or events." *Flores v. Payne*, 2018 WL *4 (W.D. La. 10/12/18) (quoting *Vanguard Finance, Inc. v. Smith*, 256 So. 662, 664 (La. App. 4. Cir. 1972 (alteration in original)). "Further, under Louisiana law, strict proof of fraud is not required to show intent to deceive and instead intent to deceive may be inferred from the surrounding circumstances." *Trahan v. Transamerica Life Ins. Co.*, 2020 WL 3196725 *10 (M.D. La. 6/15/20) (internal quotations omitted).

To prove fraud, one must show: 1) an intent to defraud, and 2) actual or potential loss or damages. *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 38, (5th Cir, 2000). In order to rescind a contract for fraud, the plaintiff must prove (1) a misrepresentation by the defendant; (2) an intent to obtain an unjust advantage; (3) that the misrepresentation related to a circumstance significantly influencing the victim's consent; and (4) a relation of confidence. *Henderson v. Windrush Oper. Co.*, 128 So. 3d 283 (La. App. 2 Cir. 8/21/13), *writ denied*, 132 So. 3d 411 (La. 2/14/14).

"Specific intent to deceive is a necessary element of fraud, and fraud cannot be based on mistake or negligence, regardless how great." *Lomont v. Bennett*, 172 So.3d 620, 634 (La. 6/30/15).

The Court finds that Church Mutual has failed to establish all of the elements of fraud. Specifically, there has been no evidence of a specific intent to deceive. The evidence

submitted concerning the Church allowing the mitigation to continue, and then deciding to demolish the Church, appears to the undersigned, if proven, as a failure to mitigate. Church Mutual's complaints that the Church sold salvageable items that could have been reused is a failure to mitigate, not fraud.  Additionally, the alleged overstatement in the proof of loss as opposed the Church's statement to Sabine Bank in and of itself does not prove fraud, and even if it did, Sabine Bank would be the party that would assert that claim.  However, the depositions testimony of Sabine Bank's representatives clearly indicates that there was no fraud involved.  Church Mutual's complaints regarding the exorbitant cost of building the new sanctuary that included materials that were not of like-kind, is a betterment, but is not fraud.   The Court has also considered Church Mutual's allegation that the Church inflated its property values during the loan process with Sabine Bank and finds that this does not indicate or establish an intent to deceive Church Mutual as to its loss claims. Likewise, Church Mutual's allegation that the Church intentionally misrepresented facts in the Affidavit of Kyle does not establish an intent to deceive Church Mutual.  Summarily, the Court finds that Church Mutual's fraud claims are more akin to claims of failure to mitigate, betterment that perhaps are not covered by the policy, and/or they do not establish an intent to deceive, a necessary element of a fraud claim. Additionally, while some of the evidence submitted by Church Mutual to establish fraud could be found by the jury as a defense to the Church's bad faith claims, the evidence does not meet the criteria for a fraud claim.

## CONCLUSION

In its motion for summary judgment, the Church moves to dismiss Church Mutual's allegations of fraud. Likewise in its Motion to Strike, the Church moves to all allegations of professional misconduct and criminal activity.[91] The Church contends that these paragraphs allege discovery violations, Federal Rule 11 violations, fabricating numbers, extortion, wire fraud and conspiracy to commit insurance fraud. In its Motion to Dismiss for failure to state a claim, the Church moves to dismiss Church Mutual's allegations that include extortion, wire fraud, insurance fraud, and conspiracy to commit fraud.

All three of these motions orbit Church Mutual's allegations that the Church committed fraud concerning its handling of the loss claim filed with Church Mutual. As explained in this ruling, while Church Mutual has certainly presented evidence of betterments, failure to mitigate, claiming losses not covered under the policy, and/or a defense to bad faith,[92] the Court finds that there is no fraud claim here and as such the instant motions will be granted.

**THUS DONE AND SIGNED** in chambers on this 21st day of July, 2025.

_____
JAMES D. CAIN, JR.
**UNITED STATES DISTRICT JUDGE**

---

[91] ¶¶ 11, 29, 31, 32, 33, 34, 35, 47, 59, 62, 66, 67, 84, 91, 96, 97, 119, 121, 125, 128, 129, 130, 131, 132, 133, 135, 139, 140(c), 158, 159, 160, 161, and 164. Doc. 83.
[92] The Court is not finding that Church Mutual has proved these defenses; that will be a decision for the jury to make at the trial of this matter.